We'll hear argument next in Johnson v. Miller, 21-1465. Thank you. Good afternoon. May it please the court, I represent the appellant, Kishan Johnson. Can you move up a little closer to the microphone? Sure. And yell at us, it's hard to hear a little bit. Okay, sure, I will. Thank you. I will. There are a number of issues on this appeal to involve interpretation of state law and city law claims. I'd like to address those first if I could. My client brought a whistleblower claim under Civil Service Law, Section 75D. And under that law, there was a provision that has since been repealed. It was repealed by the governor in December of 2015. That required anyone who was contemplating filing any type of whistleblower claim to first go to their supervisors and report it. The Court of Appeals recognized that sometimes that would be impracticable, not practical, given the fact that sometimes the supervisor was the one that was retaliating or committing the wrongdoing. And two months later, the law was repealed. What the lower court did with regard to this claim is it took that repeal to mean that a complaint, as alleged here by my client, to his supervisor and then to the executive director of Burrs about misconduct by another manager who was storing thousands of information regarding thousands of members, social security numbers, etc., on his personal Dropbox, was not a complaint or was not a disclosure to a governmental body. And I respectfully submit that the lower court got this wrong. I think the fact that the court repealed the mandatory requirements does not mean that a report to your supervisors is not worthy of protection under the New York whistleblower law. And in fact, in a case that was cited by the defendants and in subsequent case in 2021, matter of Lynn, the first department clearly, although it dismissed the case on other grounds, clearly indicated that a report by a teacher to a school administrator that they were assisting students in basically cheating on the regents exam was actionable and made a prima facie case of violation of section 75B. Assuming we were to be persuaded by the argument you've just advanced, you would still bear the burden of demonstrating causation, a question the district court didn't reach because it ruled against you on the ground of the reporting problem. But we can affirm on any ground supported on the record, and your adversary suggests that the record won't support causation here. And the thing I want you to address is that the January 18th, 2015 and spring of 2015 reports are several months before the February 18th termination, eight months before the termination. So that doesn't seem to have temporal proximity or any other ground to see causation. And while the report of the cyber attacks on February 4th is certainly close to the February 18th termination, the email chain suggests that Rich had made the decision to terminate the plaintiff by February 2nd. So tell me what I'm missing in the record that would allow a fact finder to make the causation finding in your favor. Sure, Mr. Rich was not appointed to his position until January of 2016. So he didn't have an opportunity to retaliate against anyone. In fact the record supports- But he made the decision on February 2nd to terminate. So the February 4th report could not have been the basis for the termination decision unless I'm missing something. I think you're correct on that, although I may have influenced Miller's actions. But yeah, and I don't think we're alleging that that report in and of itself made Rich make that decision. What we're alleging is my client complained to his supervisors and to the then executive director who agreed with him to some extent. And relayed the concerns that my client raised to the special commissioner of investigation who conducted an investigation both on Miller's misconduct and the misconduct of the, as alleged, of the contractors on the CPMS project. But the first opportunity that Burrs had to retaliate against my client, the first opportunity happened in early 2016. Because up until when Gordon was there and Healy were there, to a large extent they were protecting my client. They referred his complaints to SCI. As soon as Rich comes in and now moves Miller, the person who was the subject of that investigation, to a position where he would directly supervise my client. What is the evidence of that? You're speculating, I think, that Rich is listening to Miller. Maybe that's speculation. Maybe that's well-founded. What is the actual evidence of that? Well, he did say he considered what Miller had to say to him about my client. Now, he may have made that decision. It's unclear about when Miller relayed any information to him. But what's also clear is my client had a meeting with the outgoing executive director. They discussed complaints. Burrs knew about the fact that Miller was being investigated by SCI. Miller had conversations with Rich. Now, you know, for us to say that somehow corporate knowledge here isn't enough, that somehow these topics that were very prominent, and defendants don't dispute this, that there was issues with the CPMS. I mean, they try to downplay it saying, oh, yeah, Rich agreed with your client. Well, he didn't. So if this is your theory, it tends to undermine your theory of racial discrimination, I think. Well, you know, there were two things. Is that right? Well, I don't think so, because I think two things can happen at the same time. And clearly from Rich's perspective, there were two things that happened to my client, that at least under the city law, which the district court did not do any separate analysis of the city law claims in this case to determine a number of issues. First, you had members of the board or a member of the board trying to get my client to accept a $50,000 reduction in his salary, which was $50,000 less than his non-black predecessor had earned. So that was at the beginning of the stage, and there were some issues there about governance and whether the DOE or someone like Mr. Orlando could even do that. And the law department weighed in on it and said, no, you can't. And DCAS had approved the salary. My client was hired pursuant to a civil service posting. They can't just willy-nilly go and try to cut the salary. So that was the first part. The second part of this is just the comments that Rich made as he was terminating my client about growing marijuana. The only other two people in the room were two African-American men. My client had dreadlocks. I mean, you can argue that perhaps that may have been a straight comment under the federal law. I submit it wasn't a straight comment under the city law. But then you had other evidence. The fact that almost everyone except for Miller, everyone else who had a managerial position at Burrs, who's African-American, left. And Mr. Rich was responsible for the demotion of Mr. Wint. He was responsible for the termination of Mr. Jennings. He was responsible for the termination of another female manager who is African-American, Mr. Rond. And given that, I think all that evidence, if you take this mosaic, as you call it, if you take all this evidence, there's enough there for a jury to see what could have been motivating Mr. Rich here. Right, Mr. Rich. And certainly, I mean, we can understand Mr. Miller definitely had a motive, given the fact that he had to hire an attorney and go through SCI. And he knew my client. And he claimed, I think I have a case, self-serving denial that you didn't know about. It doesn't suffice, given the fact that he didn't know my client made the complaint. No one else there, Mr. Healy, admittedly, didn't have any IT experience. Mr. Gordon was an attorney. He didn't have IT experience. The only person from whom this information could have come was Mr. Johnson. In addition to that, Mr. Johnson had warned Mr. Miller early on, hey, you can't keep this information in your drop box. So it was clear all of this stemmed from Mr. Johnson's actions. We'll hear from your friend on the other side. You deserve some time for rebuttal. Thank you. Good afternoon. May it please the court. Chloe Moon on behalf of the defendant at police. Miller, Rich. Speak right up. Because I have attended this, so it's hard to hear. Sorry. On behalf of defendant at police, Miller, Rich, Orlando, Board of Education Retirement System of the City of New York. The district court correctly granted summary judgment for two primary reasons. Plaintiff's complaints were internal emails or conversations, which were pursuant to his official duties, and they were not disclosures to a governmental body, defeating his First Amendment and his Whistleblower Protection Act claims. But in any event, there was no causation. And the defendants had legitimate reasons for terminating plaintiff here, which also defeats those claims. Now, the argument that your adversary made when I asked about causation was that we had to consider that Mr. Rich wasn't in a position to retaliate until January of 2016. What's your response to that? Yeah, I think the record makes very clear that Rich was hired in order to solve the CPMS project problems, the longstanding delays, and the over budget. And so he came in in January, and that was his first. It is true that he was hired then. Right, but the argument that I think counsel was making was we shouldn't be concerned about temporality in this case, about the eight month delay, because Mr. Rich was only in a position to retaliate within a month and a half of this. So are you basically agreeing with that and saying, well, there's a different ground on which to affirm? I wouldn't say we're agreeing, but I do think there are different grounds on which to affirm here. And that's the legitimate- If we agree with the other grounds, how do we clear the hurdle about when Mr. Rich had an opportunity to retaliate? Yeah, so I think one way to do that is to say, well, Rich was unaware of the reports made by Miller. And he testified as much. He said that he didn't know who had made the complaints against who. He was generally aware of something, but nothing of the specificity that would allow for that kind of causation. But to the legitimate non-discriminatory reasons, we do have, from the start of plaintiff's employment record, that he wasn't able to complete the basic task, that he resists some of those basic tasks. And what was triggering information for Rich in the termination decision really was hearing from those outside contractors who said he was not qualified and he was incapable and still learning on the job. To my opponent's whistleblower claims, specifically to Civil Service Law 75B, the court below correctly decided that what was envisioned by the Civil Service Law is protection of whistleblower claims, not comments made in meetings pursuant to your job with your direct supervisors and colleagues. But this court need not reach that statutory question because of those legitimate non-discriminatory reasons for terminating plaintiff here. I realize, can you unscramble the repeal of the section that required the, I mean, it's confusing. So there was a provision that required notice to an immediate supervisor, and that then could, as I understand the statute, that then could serve as notice to the agency if such notice hadn't been given. Is that right? Right. And so that section was repealed following the criticism by the New York Court of Appeals. And so what they did in essence was, in recognizing the criticism, they also excised the section that imputed notice to the agency as a result of notice to the supervisor. Is that correct? That is correct, yes. That's the way you read it. Yes. And so the case that she cited, York, I think it is, or whatever the case was cited in the brief, is no longer the law in that regard. So to understand 75B now correctly is that notice has to be given to the agency? To an external body, yes, I believe. Okay. Yes, and I think what helps when you think about that is that section has those two requirements. It has both the internal reporting requirement and the idea that an internal report is deemed a disclosure. And removing both of those doesn't change the distinction between internal and external. It just takes away that requirement. Okay. That's how we view it. And then as to plaintiff's race discrimination claims, they also fail because defendants produced a legitimate non-discriminatory reason. And a single stray remark that's neutral on its face does not prove the pretext that plaintiff needs to use. You know, it's so strange to make that kind of statement. I just can't imagine why one would say it. And the other thing is that later on when he's asked about someone else that he let go, he said, I couldn't pick him out of a lineup. Yes, and I would say that both of those comments are facially neutral. And what this court has said before- Do you think it's a facially neutral? Yeah, I think it's a common enough phrase that you don't know somebody that you don't. You can't recognize their face. But I would also say that the facially neutral comments- How about the growing marijuana comment? Yes, sir. Can you explain to me how that is a facially neutral comment? Yes, it's not at all connected to plaintiff. And when you compare it to a case like Payne versus the New York City Police Department where the comments about marijuana or about anything like that were connected to the plaintiff and were numerous and repetitive, and here you just have a comment about marijuana with no connection to the hiring decision, Doesn't that make it more suspicious, less suspicious? I wouldn't say so. It just grows, comes out of nowhere. I wouldn't say so, your honor. I think that- You wouldn't say so. When you go into someone's office, it's very hot. And of all the things you could talk about, like you could fry an egg on the floor, the comment that's made is you could grow marijuana in here. And that's made to someone who's wearing dreadlocks. What's the inference that we- or that a fact finder could draw from that? Right. Well, and I think the thing is that the plaintiff has to prove that pretext here. And here it's just a facially neutral without the implications surrounding it, that there's any racial discriminatory animus. That just doesn't- that's just not enough to prove that pretext. You don't think that a fact finder could plausibly draw the inference that it was based on the fact that the defendant was wearing dreadlocks? I don't believe so. I think you'd have to take a few steps in presuming things that are nefarious that aren't on the face of this comment. Okay. And for these reasons, we ask this court to affirm. Thank you so much. Thank you. Thank you very much. Thank you. I just want to address a couple of points. You want to take your- if you want to. Yes, yes. It's up to you. Thank you. I don't want to. What we have here are not only the two comments that were made by Mr. Rich, but we also have comments that he made about the qualifications of the African-American managers at Burrs. And we provided testimony or we provided affidavits from them. The city didn't really provide any documents to refute the reasons. With regard to pretext, Mr. Rich advanced some reasons that I addressed in my brief, so I won't go into them. None of them were specific. And the only one that was specific was something that occurred six months before that Mr. Miller then created or generated an email about, I think, four days after Mr. Rich had decided to terminate my client. But the complaint from the other client or from the other entity predated that, right? We don't know. The complaint that we had, it was the contractor. There were no specifics. I mean, there were some emails going on, some quibbling about who's responsible for doing what, and my client was taking the position, I'm only taking directives from Mr. Healy, who's my boss. And the city had another agency called DO-IT that was responsible for overseeing the technology assistance to the CTMS project. But there was nothing in right. There's no evaluation. There's no memo. Hey, shape up. You're not doing a great job. We're going to lay you off if you don't take care of this. There's none of that. Is it clear that there was a complaint from another entity? No. The only thing that Mr. Rich testified about in his deposition was that the DO-IT consultants had complained about my client. Yes. Nothing in writing. The city did not produce anything. They could have gotten an affidavit from one of those individuals. They could have taken a deposition from one of those individuals to support this. None of this was supported. And it's very telling that when they were trying- So this is testimony but no other support? There's no support whatsoever. And, in fact, Mr. Wise was one of the people who hired my client. The other consultant- We are on summary judgment. And to the extent you're disputing that there was, are you disputing that there was such a complaint? Yes. You testified to it under oath. Now you're sworn to it under oath. And your client has no direct knowledge of this. And so I'm trying to find out what efforts you made to find out or to procure whatever records there would be. We made a discovery demand and there were no documents produced of any complaints about my client. I mean, I presume that if the city had those complaints they would have attached them to their summary judgment motion. There were no complaints. And, in fact, my client provided testimony that one of the other consultants had secretly offered him a job once he got laid off to work on the same project but on the other end. So there's enough here for a jury to decide whether the reasons advanced by Mr. Rich or supported by Mr. Miller are real reasons or true reasons. And we suspect they're not, given the lack of any documentation to support these allegations. And we address it in the brief, but there really is nothing except for one email. Given that this is on summary judgment, is it basically your position that you'll go to trial and you'll try to impeach these people? I mean, you don't have any, and argue that they haven't adequately demonstrated that that's the real reason? I mean, it's not like you're going to get further discovery now, right? You're basically going to try and impeach them or argue that they're not credible? I mean, if the IT consultants come to testify, the city never produced anyone or any complaint in writing about my client. So you'll try to preclude it on the theory that you didn't get it in discovery? If it exists. So how are you going to prove your case just by basically saying that you'll disavow these complaints? The former executive director of Burbs, he supervised, he was the second supervisory for my client. He had no complaints. In fact, when he testified or he put an affidavit in, and I think Mr. Rich confirmed it, that he met Mr. Rich before Mr. Rich took over. And he told him, I have no complaints about Mr. Johnson. I think he's doing a great job. And that was in December of 2015. So if they had been complaints from outside consultants, certainly they would have been conveyed to Mr. Gordon. But right now, there was testimony unrebutted. I mean, ironically, you're leveraging it in a different way. But it's unrebutted that he understood that there were complaints about your client. That was his testimony. That's his testimony. Yes. Are you saying that that's not admissible evidence? No, let there be admissible evidence. How do you impeach that? Where are the documents? Where are the documents from anyone complaining about that? Thank you. Thank you very much. Okay, thank you. We'll reserve the decision. That concludes today's argument calendar. And I'll ask the Quorum Deputy to adjourn the Court. Please. Court is adjourned.